Thank you and good morning everyone. We'll proceed with the first case, U.S. v. Bergrin. Mr. Sanders. May it please the Court. I'm Stephen G. Sanders, Assistant United States Attorney for the United States, the appellant and the petitioner in these two consolidated appeals. I'd like to reserve five minutes for rebuttal. Yes, sir. Thank you. Your Honors, we're sorry to be here for the second time in 15 months, but we are back here before this Court because Judge Martini's statements and his actions show that he will not allow the government to try the RICO and VICAR counts that this Court said were properly pled in the indictment. This Court explained... When you say properly try, what do you mean? No, I say he will not allow us to try RICO and VICAR counts that are properly pled in the indictment. That's what this Court held in... Well, he hasn't prevented you from trying those cases. He simply ordered or directed the order of trial. Well, he has said he is using his authority under Rule 14 to prevent us from trying the RICO counts because they contain what he considers an element of spillover prejudice that he cannot cure. He hasn't dismissed the RICO counts. They're still there, right? He has not. I mean, I'm bothered by that characterization and your persistence in the face of Judge Fuente's questions to repeat that characterization in a case that has become as controversial as this one apparently has and where it's quite evident from the record the feelings between counsel and the court have become less and less amiable, shall we say, and it does cause me to question the government's position when you characterize it that way. Let me address it this way, Judge Smith, and I would rather quote directly from the record. This is Judge Martini on December 14th. We've already had this Court's reversal, one severance, and a motion for a second severance. It would have been inherently unfair to have McGrin convicted under a RICO the way it was framed for the murder case. That's how I felt, and I still feel that way. Well, if he feels that it's unfair for you to go forward with the RICO count because it binds everything together, and in the first instance he thinks you should separate out the chemo murder part of the case and have you try that first, something which I understand you did not appeal or try to appeal the first go-round. But if he views it that way and he leaves the RICO intact, he doesn't say, I'm dismissing it, he just says, we're going to go with the substantive count first because I think the risk of prejudice is so high here. How can you square that ruling with the assertion that he's not letting you try the RICO count? He's saying, I'm going to do this piece first, and then we do the RICO count, isn't he? Well, that's what his form of order says, but the December 27th order… Pretty good thing to go by, isn't it? Well, he says that in his order, but he also says, I am severing out 14 substantive counts and requiring you to try them first because if I don't do that, you're going to be… That's said in the order of the trial. In other words, when you say he is preventing us from trying our RICO case, he didn't dismiss the RICO counts of the indictment, did he? He has not dismissed this time. And he did not say, we're not going to let you try your RICO case, did he? He has indicated he will let us try it. Whether he's going to let us try it in the form it was pled in the indictment is an open question based on certain statements in the record, which I'll get to. Mr. Sanders, if you were arguing that it is apparent from the record that Judge Martini doesn't like RICO, I would be inclined to agree with you speaking only for myself. Lots of people don't like RICO. Chief Justice Rehnquist didn't like RICO and made his feelings on that subject known in various writings. But we're obviously going to be getting to various statements made by the district judge when we reach the question that you've been raised with respect to disqualification. But it seems to me it's not helpful to be spending valuable time by arguing a point to us that is not explicitly demonstrated by the record when certain things are explicitly demonstrated by the record. And that was by way of introduction. And let me say I'm framing the issue because I think the hostility to the RICO statute as it's applied to this case, in other words, using the RICO statute when there's a murder joined with an attempted murder and the judge's earnest and deep-seated belief that that's somehow unfair, inherently unfair is the judge's words. Is there anything inherently wrong with a district judge directing the government to try certain counts of an indictment before other counts of the indictment? It is if it's meant to undermine, if it undermines the intent of Congress and if it overrides the intent of Congress. The intent of Congress in what respect? Congress said it is a crime to use an enterprise to commit a pattern of racketeering activity. All of these substantive counts are. I understand that, and that's fine. But my question was the district judge in the judge's inherent power to direct and control his or her docket may order from time to time which cases should go first. Do you disagree or agree with that? The district judge certainly has that discretion, but when you exercise it in a way to say try these counts first because I don't want you to try these three counts over here because they contain an inherent feature of what he called spillover prejudice. He can't cure. He's basically said I cannot, there's nothing he can do to prevent, and we disagree with him on this, but to prevent the spillover effect, as he calls it, of the Estevez evidence onto the chemo because those are intrinsic to counts one through three. So normally you use Rule 14 if you want to split up counts because one count is going to taint another. That's not what he's doing with the second severance. The second severance is simply to delay or to put off a RICO trial, effectively hoping we will just pack up and go home. So as we stand there is no rationale for the second severance? There is no. It's no logical rationale. There's been none articulated. How can you say there's no logical rationale for that? I mean I know in your briefing you said, well, it's all going to come in together anyway, ultimately if we do the RICO count later. But isn't it perfectly predictable that if, for example, you win on the chemo counts that all the assertions, all the concern he's got about spillover evidence with respect to that is gone? So he has satisfied his concern. And if you lose on the chemo counts, you can fully expect that the other side will say that can't properly be in the case at all and they'll move to keep it out at that juncture. But to say it's irrelevant, it's all going to come in anyway, doesn't it ignore what would happen if the chemo counts were actually tried first? Well, the district judge has never articulated and Mr. Berggruen in his briefing in this court hasn't tried to justify these severances on the theory, at least on the second half of your Honor's statement. In other words, that there's going to be a motion to bar us. But let's say that that's that 100% predictable. I mean, if you go to trial on chemo, you get all the evidence you want, leave aside the evidentiary rulings, which you haven't had a chance to get to yet. But leave that aside. Assume you got everything in that you wanted to and you lost. Isn't it absolutely predictable that the defense would come in when you came time to try that RICO count and say he's been acquitted of that? You can't make that part of a pattern of rack-tearing activity. I agree with you. It's 100% predictable because Mr. Berggruen has already made that argument. But now let me take that and take it one step further. But if in fact that's going to happen, all the more reason why we should get to try our RICO counts because I'm not sure I follow the logic of that because it sounds like what you're saying is we're entitled to do the RICO first because we don't want the risk of losing the chemo count. And Congress said we get to do it that way. And I guess it's that last step implicit in your statement that I'd like to press you on a little bit. What is it in statutes or the case law that says you're entitled to do the RICO count first and not substantive counts? Well, Your Honor, I have an easy answer. If we hadn't charged any substantive counts, right, we followed Department of Justice policy, what we do in every RICO case, which is to charge the federal crimes that arise directly from the predicate if we had no substantive counts in this case, we wouldn't be having this debate. And I said that to you. But you did. So, I mean, it doesn't help to say if there were no counts to sever, we wouldn't be talking about severance. But there are. So we are. So where's the precedent for your assertion that it's beyond the can of a district court's power under Rule 14 to say, I'm going with substantive counts first, even if you've got a RICO count? Well, my – I mean, it's the absence of precedent. And we have not – and it's not for lack of looking. We have never but not been able to find published, unpublished, reported, unreported, any decision in which there's been just a single defendant in the indictment and a district court used its authority under Rule 14 to take substantive counts that arise directly from the predicate acts of racketeering and say, government, try those first, and then we'll see what happens later. Mr. Senator, is there any support for your position? Well, I've cited the Persico case and a couple of other cases in which similar severance motions were made, even in multi-defendant cases, and district courts refused to sever because they said it would undermine the intent of the RICO statute. Mr. Sanders, let me switch the order here a little bit because an extremely important question before us is the appellate jurisdiction question. Correct. And severance is an exquisitely discretionary judgment call for any trial judge, as is the management of that trial judge's docket. And I think you would agree with me that this is not the garden variety appellate jurisdiction question where we're talking about a severance determination by a district judge. What is your basis? What's your strongest argument for why we should assume appellate jurisdiction over the severance determination, which is really a determination of which case goes to trial or which counts go to trial first? I have three answers, and they're the ones in my brief, and I'll give them in order. I asked for the best. Right. Well, I'll go with the best first. I realize we're talking about pendent jurisdiction. We're talking about collateral jurisdiction. I realize we're talking about pendent. Right. I mean, the Estevez plot evidence, there is clearly 3731 jurisdiction over that exclusion because no matter what the district judge said on November 23rd, by granting another severance, precisely to prevent Estevez evidence from tainting the chemo evidence in counts one through three, has reinforced his order. So there's no doubt about the finality and the concreteness of that order. And if Your Honors agree with us that the Estevez plot evidence was improperly excluded, then you can exercise pendent appellate jurisdiction over the severance. Over the exclusion of the evidence. Right. And then you have a 3731 jurisdictional hook. You mean if the Estevez plot is back in the case. Right. We have no jurisdictional problem. That's correct because it is the very conclusion that the Estevez plot evidence unfairly taints the jury's consideration of the chemo case that has driven the first severance and the second severance and a lot of the evidentiary rulings in this case. And once that falls, so do the severances. Maybe you can tell us why the Estevez issue should be back in the case. I'd be happy to. The key issue in counts 12 and 13 is what was Mr. Berggren's intent when he passed the name of the informant from his client who was in jail to his client's drug associates who were out on the street. He relayed the name of the informant. Then he met with them a week later and made some statements where he didn't use the word dead. I want him dead. He said get rid of him. Don't let him testify. The problem is the reason that the district court gave for excluding the evidence would seem pretty reasonable to me, which is that this incident happened four years ago after the chemo murder. In other words, it was remote. And he also said that, if I remember correctly, a statement that is made after the end of a conspiracy should be excluded as tending to be propensity evidence rather than evidence related to knowledge or intent. How is that an abuse of discretion? It is because he didn't employ the proper test, first of all. He went into this issue basically assuming that acts occurring later are presumptively less probative than prior acts to show intent. Is that what Boyd means? That's not the holding of Boyd. That's a statement that was dropped into Boyd. Boyd said you couldn't use a statement. The holding of Boyd is that the prosecutor there articulated only a propensity inference in offering later acts to prove a conspiracy. Pretty strong statement, though, right, that the relevance escaped that panel or at least two members of it? It is a strong statement. I mean, Judge Smith's later opinion in Ansell v. Green Acres made very clear that it's subject to the same test. And the key issue is similarity. And that's what the Second Circuit case in Curley says. If the acts are so similar, right, then you don't have to worry about propensity. Then it's probative. Let me ask you a question, if I might, real quickly, on the appellate jurisdiction point again. You've said that the severance issue rests on the same reasoning as the evidentiary issue. But is the test for this pendant appellate jurisdiction that you're pressing on us, is it a conjunctive or a disjunctive test? I mean, we sort of have some schizophrenic precedent on this point. And does it matter? Does it have to be inextricably linked and prevent meaningful review or or prevent meaningful review? I see my time is up. May I answer? Yes, please. Thank you. It's or. And Swint makes that clear. Clinton v. Jones makes that clear. There it happened to satisfy both. But Swint makes clear it's one or the other. If it is conjunctive, though, if it's an and, isn't that a problem for the government here? Because we could look at the evidentiary stuff and meaningfully review it without talking about severance, couldn't we? I think you could. I think that's safe to say. But I think Judge Becker's opinion in Maker applied, even though it was prior to Swint, but it applied the proper understanding of pendant appellate jurisdiction. Could you give me your best shot for the exercise of mandamus jurisdiction? My best shot? I'll just read a couple quotes. I know you've read my brief. I mean, I never thought these cases should have been joined from the first day I read that indictment before the judges read. Is it that there's no other way to review these decisions except through mandamus? If you have to exercise mandamus jurisdiction, then we're asking you to overturn the severance, number one, or at least the order of trials, allow us to try our RICO counts, because the longer this case takes, right, the longer our witnesses are hanging out there who are all in protective custody who are exposed, the harder it becomes to prove our RICO case. All right. I think I better. Let me ask one clarification question. Did I understand you to argue that Judge Martini excluded the estivus evidence because of a belief that there's a per se bar to subsequent evidence? No. All right. It was made solely on the basis of probative value, was it not? Wasn't that the basis of his ruling? And thank you for letting me go back to that because I wanted to add this one piece. He said it's later, right, it's four years later, but he ignored. If you look at what we called our 404B proffer, which I think is docket entry 304-1, pages 10 through 27 list innumerable acts of witness tampering from before the chemo murder, after the chemo murder, all the way up to the estivus. So these are not disconnected bookends. You're not responding to my clarification question, Mr. Sanders. I was getting there. Although I think you did say, no, he did not rule out per se subsequent acts as appropriate 404B matter. But isn't it also correct that what he did was hinge that ruling upon a determination of what the probative value of that evidence was, and that he took into account the subsequent nature of the evidence in that probative value evaluation? He did do that, but what he didn't do was look at the fact that with respect to estivus, Mr. Berggruen is 100% clear about his intent when he says, I've done this before, and no witness, no case. So we know that so that's why we wanted to put that in, because it sheds light on one of the critical factual disputes from what happened. I know it's four years earlier, but as I said, it's not like it's one event and then the other. We'll get you back on rebuttal. Thank you very much. Thank you, Mr. Sanders. Mr. Lesburg. Thank you, Your Honor. Good morning, and may it please the Court. My name is Lawrence S. Lesburg, and I represent the appellee, Paul Berggruen, in this matter. My second time back before Judge Jordan in this case. It is always my great pleasure to be before this Court, but most respectfully, I believe that the Court lacks jurisdiction fundamentally with respect to each of the issues in this case. How is it that we lack it with respect to the evidentiary rulings? There's no question but that 18 U.S.C. 3731 provides for jurisdiction with respect to the evidentiary rulings. It's a straightforward exclusion. Absolutely, except for one thing, which is the way in which the ruling took place. The statute requires that there be either a decision or an order. There was no order. Well, there was a statement that was pretty, in fact, I would say really emphatic, from the district court judge that he was absolutely, quote-unquote, going to adhere to his prior rulings. Now, I know and read what you wrote, you know, you try to find some daylight around that, but what is it in the history of this case, particularly Judge Martini's handling of the evidentiary rulings, that would cause us to think, given that he said repeatedly, I've thought this was bad from the get-go, when he says, I absolutely am going to adhere to that, that he wasn't making a statement that we should, a ruling that we should look at as a ruling? Let me answer that as directly as I can, because you asked a couple of questions in there. The first is, respectfully, I don't think I was looking for daylight. Just read the end of the sentence. He says, absolutely. I don't expect I would be changing those rulings. I don't expect I would be changing the rulings. And let's go to Judge Jordan's question about the history. What in the history of this matter would lead you to believe that he might not adhere to that? The history of this matter is one in which he made rulings, he changed the rulings as the case went along. Mr. Rosberg, you try a lot of cases. That's the nature of a trial. Many of us who have tried cases know that a pretrial ruling is always implicitly subject to being revised. So if we accept your position, that completely eviscerates the finality that 3731 would allow for appeal purposes. It eviscerates the finality that 3731 requires. Your very point is 100% correct, which is, and that's why the statute says a decision or an order. There is no order here. What should have happened? No order, no ruling would be appealable if we accept your position, because every implicit, every ruling implicit contains within it the possibility of revision or being overturned during trial. No, no, no. But it has to be way more final than what he says is absolutely, but I would expect it. Unless you, he says, unless you can convince me otherwise. And the history of this matter was that he could be convinced otherwise. Look, let's talk about. He could be convinced otherwise by the defense. I mean, if we look at the history of this, he was, and I don't mean to imply by that that some of the rulings didn't go the prosecution's way, but just focusing on the evidentiary rulings, they are, they appear to be consistently narrowing what the prosecution is permitted to do. There's a statement that the POSO evidence can come in, and then there's a statement that, no, it can't. There's a statement that Estevez's information can come in, even if the tape recording can't. And then there's a ruling that, no, it can't. Right. There's a narrowing, a narrowing, a narrowing, and in spite of repeated motions for reconsideration by the prosecution, those are denied. So when the district judge says, after narrowing repeatedly what the government can rely on and denying repeatedly their motions for consideration, when the district judge says, absolutely I'm sticking with my rulings, I guess I'm puzzled by your assertion that that there's really a question mark about what he's going to do. Your Honor, let me say two things about that. First, candidly, I think that that position is a better one with respect to Estevez than it is with respect to POSO. And if you look at what the government cites for the proposition that Judge Martini was unmovable with respect to these issues, they really are focusing on the Estevez piece. In fact, they go through a litany of why there's no chance that he would have changed his mind. No, it's the same thing with POSO. What he did with POSO is he suggested he was going to allow it in. And then once the jury was sworn in and the trial had already started, he said, no, I'm not going to let in. Well, POSO was much later. He reversed himself on POSO much, much later. The point is that he reversed himself in both instances. There's no question. There's no question that as the case developed and as Judge Martini saw the evidence develop, he changed his view with respect to this. And some of this goes directly to some of the points about the admissibility of the 404B evidence in the first place. And I'm digressing or progressing, as the case may be. But the truth of the matter is that with particular respect to Estevez, as the case developed, Paul Berggren's defense was not, as the government thought it was going to be, that he said no chemo, no case, but didn't mean anything by that. The defense as it evolved very quickly was that he never actually said that. Actually, I don't know whether we were reading the same record or not. Because I went back in and I was reading stuff where Mr. Berggren was saying, I never, you know, I never intended to harm a hair on that man's head. I revealed the name of chemo. Yes, I did. But I was obligated to do it. It was my only purpose to faithfully and zealously represent my client. There was never a moment's thought that harm would come to this nice fellow. And if that's not a defense rooted in intent and motive, I don't know what is. Okay, but, Your Honor, let's talk about, respectfully, you're coalescing two different things. There's two different sets of statements that Mr. Berggren is alleged to have made in this case. One he admits, the other he denies. The one he admits is he admits that from the jail cell on the day of the arrest, he calls these other people and he reveals the identity of the informant. With respect to that information, there's no question but that his intent is very much at issue. And the government had every right to prove intent. Once that intent is in play, first up, let's do, let's take them separately. The fact that he denies saying no chemo, no case, you know, that's an evidentiary issue. One would have thought was for the jury, not for the judge to decide up front. But setting that aside for a second, once you acknowledge intent is in the case based on what he admits his defenses and what he frankly can't deny his defenses because he says it in opening, he uses it in cross, he says it in his closing. Once that's in play, the 404B intent and motive stuff is clearly in play. And that leads us to, or me at least, want to ask you specifically about Pozo. How can, I mean, wasn't what the judge did in reversing himself directly in opposition to what Huddleston says, which is you don't get to weigh the evidence. You just have to make a sort of a 104 decision and then leave it to the jury. How can you defend the judge's saying, and I think I've got it right here, saying things like problem will go away if the witness goes away. It's a, you would agree, it's a sufficiency determination. Absolutely. Here's my answer to that question, Judge Jordan, so you don't have to take too much time pulling out those statements. Because those are not the statements that I would defend as showing that Judge Martini properly exercises discretion, this discretionary ruling in keeping out this highly prejudicial evidence. That is highly prejudicial to the extent that we're talking about something that is clearly collateral. Read, if I would respectfully suggest, all of Judge Martini's ruling with respect to Pozo. For sure, he opined on Pozo's potential credibility, and that he should not have done. But if you look carefully, and not even that carefully. Once he does that, though, once he does that, hasn't he crossed the line? I mean, that's a little like saying the food's only sort of poison. Once that improper thing is in there, is that not an abuse of discretion to base a ruling even partly on a weighing of evidence, which the Supreme Court has forbidden him to do? You know, I really wish it were, but many, many times I appear in this court and I make just those arguments, and the court confronts me with the other reasons that a court gave for exercising its discretion against me in evidentiary rulings. And here, there were other reasons that Judge Martini set forth. And those are the reasons upon which we rely. Judge Martini says this would engender a mini-trial. It would be confusing because this wasn't the same formulation of the language. It wasn't like this would explain what no chemo, no case meant. Now, wait a second. That's an assertion about the probative value, which he's obligated to look at, right? But how is it the case that saying in the Pozo instance, if this witness disappears, your headache goes away, too, is not probative of the meaning of no chemo, no case? How can it rationally be asserted that an ambiguous statement, no chemo, no case, is not put in a much starker light by a witness who, Judge Martini pointed out in his earlier ruling, was hearing this stuff roughly contemporaneously. If this witness disappears, your problem disappears. The answer to that question is that the no chemo, no case comment was one and goes directly to the Estevez point. On Estevez, there was an argument that the government made, and they just made it again today, that you have to look at how close, how much of an identity, how idiosyncratic is the word that they use in their brief. A statement is to determine whether saying something one time elucidates what somebody said another time. So what they say is that the Estevez comment to Mr. Bergman's comment to Estevez, which is if there are no witnesses, there will be no case. Aren't they incredibly parallel? In Estevez, they are. In Estevez, they are. And that's why it's relevant that – Well, the statement made in Pozo is the problem will go away if you or if he could take out the witness. Right. Is that right? There's nothing ambiguous about that statement at all. Because there's nothing – Isn't that shed light on what no chemo, no case means? I don't think it helps understand that at all. I mean, the problem – I just don't. I mean, it could help elucidate whether Mr. Bergman had a practice of doing this. But that does not – what Judge Martini held in examining the evidence was that it's not going to help a jury understand whether no chemo, no case means go kill the witness. Why don't you leave that to the lawyers to argue before the jury? Why didn't he leave – The argument that it doesn't make any sense, it doesn't elucidate, or the prosecution – The real answer to the question – Yes, it does. This is what he meant. The real answer to the question was that that was not ever going to be argued by Mr. Bergman. Mr. Bergman did say, I never intended to hurt anybody in opening and summation. Respectfully, that didn't – was not on cross-examination. But he – Just because he was not going to argue that does not mean that the statements are inadmissible. The – if there's anything that's clear from Old Chief, it's that the probative value of a statement in the 404B context in particular, where you're allowing evidence of other crimes, collateral evidence to an extent, depends on whether it actually addresses an issue in dispute. And an issue that was not in dispute by Mr. Bergman was what he meant by no chemo, no case. And that's because – It's a hard time understanding that. When you say that was not in dispute, it was certainly at the heart of the case that he was saying, I never intended for this man to be hurt. So if no chemo, no case means, as the government asserts, you intended to have the witness killed, certainly he was disputing that, right? Your Honor, he disputed that he said it. Yeah. Which is a – which – So his defense was not – Mr. Musberg is sort of beside the point for our discussion here, right? That's like – that doesn't mean anything in the context of whether he said it or not. That's something for the jury to decide. It doesn't matter if there's a dispute that he says it for partisan purposes, right? It only matters that someone testifies that he did say it, which renders it a sufficiency issue. Respectfully, it's not – for purposes – what you mean by Huddleston purposes, in terms of the court's – whether the court was correct or incorrect in judging the credibility of that witness at that time, of course I agree with you. Of course I agree with you. And that was not – that's not our argument. What our argument is, is that with respect to the statement, no chemo, no case, the government, they have every right to put on evidence of intent that's direct. And they put on a ton of evidence of intent. I'm trying to figure out what the value or importance of Mr. McGrin's denial has here, other than, as my colleagues have suggested, that it renders it a question for the jury ultimately as to whether or not he said it. Absolutely. The jury – there's no question in my mind. It had to do for admissibility well-known purposes. The jury had the right, had the obligation, and respectfully probably did spend time in that jury room talking about, did Mr. McGrin make that statement or didn't he? What Mr. McGrin did not open on, close on, cross-examine on, or otherwise take the position was that by saying no chemo, no case, he didn't mean kill somebody. He did not take that position. That was not a disputed issue at the trial. And it's very clear that in, from all the case law, that in deciding whether a point under one of the prongs of 404B is met, one of the ways in which you get in this other evidence is met, it has to be an issue that's a live issue in the case. Let me ask something since we're sort of running down on time here that I think is very important, which we spent a lot of time with Mr. Sanders on. We're arguing about evidentiary stuff for the very reason that the judge said, we're doing the subset of counts first. And the government's emphatic assertion is that we're entitled to try this RICO count first. And if the judge had not improperly interfered with our ability to do that, none of these evidentiary issues would even matter because it would all be evidence coming in pertinent to the pattern of racketeering activity. I would ask you to respond to their assertion that it is beyond the district judge's authority, that in fact it's an abusive authority and a fighting of Congress to take the position that was taken here. I believe that the government's contention is completely and totally unprecedented. There is no authority whatsoever for the proposition that a district judge, A, does not have the discretion, which can be appealed, to grant a severance, or if it can be appealed. I mean, a severance alone is a difficult thing for the government to appeal. But we appeal from denials of severances all the time. And this court almost always tells us, you know, conviction affirmed, that's within the court's discretion. So the severance itself is a discretionary call of the district judge based upon all the facts. What if the severance decision has no base in the case? What, for example, if we disagree with the judge's ruling with respect to the Estevez exclusion? If the court were to disagree with the district court's decision with respect to Estevez, first of all, we haven't really argued that much about Estevez, but with respect to Estevez, once again, that is a discretionary decision as to whether to admit or not admit 404B evidence that certainly would have been explosive and respectfully, I believe, was properly excluded. But if you disagree, your only way to reverse respectfully would be to find Mandamus. And for this to be an appropriate subject of Mandamus, it would have to be so far beyond the judge's ken, that is, that the judge usurped the powers of the executive branch or exceeded his discretionary powers. But we can't do that if it is simply a matter of abuse of discretion, can we? Respectfully, Your Honor, no, you cannot. What Mandamus is specifically for is for when judges overstep the bounds that are provided to them by the Constitution. It is not overstepping the bounds. How about I take this to be the government's argument. The judge never liked this RICO count, thought it was fundamentally unfair, said so from the start. We took him up, you, Third Circuit, reversed him and said, like it or not, this is what Congress says, they're entitled to plead and prove this. It goes back down and the judge undertakes a series of procedural and evidentiary maneuvers calculated to prevent the RICO case from ever coming to trial and he is candid in saying, I think it's fundamentally unfair. It cannot fairly be tried. Now, if it's true the way they're characterizing the record, why would Mandamus, A, not be appropriate and, B, why would we, if we did send it back, why would we send it back to a judge who apparently feels that it just, he can't, that it's not fair. He can't accept the fairness of it. Your Honor, Judge Martini believes that in order for Mr. Berggren to get a fair trial on certain counts, evidence that would otherwise be joined should not be in the case. That's what severance is for. That's not really answering my question. I'm trying to get you to respond to their specific point. I understand. It's not just evidentiary rulings. He's been candid that it's the RICO count he hates. And he has said over and over and over that if and when the time comes, he will try that case. There is no, nothing in this record to support the government's contention that Judge Martini will not try that case. In fact, the questions earlier were, I'm sorry. The problem is that he seems to be trying the cases in the order of his preference or dislike for RICO. Your Honor, he's permitted. It seems to me to be a totally inappropriate basis for severance. The, it isn't, I see that I'm out of time. And that happened with the chemo case also. He purposefully wanted to take the chemo case first and then not try the RICO case. I should note with respect, can I finish? Sure, please. With respect to the chemo case in particular, not only did the government not appeal that, but the government didn't even argue with him about the notion that that should come first. They certainly opposed that severance. But Judge Martini believes that, and it was within his discretion to believe, that certain counts ought to be tried separately because if they're not tried separately, then there won't be fair trials. If you read the Supreme Court's decision in Zafiro, that's when severance is appropriate. How, may I? How do you answer the government's response that we could have chosen to only charge RICO? We're entitled to do that. So his assertion that this is fundamentally unfair if I don't try these first is really an assertion that RICO is fundamentally unfair, and he's not entitled to make that judgment. Your Honor, if the government had only charged RICO, we would have had a RICO trial. Once this court reversed and sent the matter back to Judge Martini, there would have been a trial on RICO. Just as he says now, I'm going to try these other cases so we can have fair trials on these other counts. He's not saying that the only way we can have fair trials on these other counts is because I hate RICO. He's pointing to specific evidentiary concerns. Matters that would be in a joint trial that would not be in a trial of the count alone. Exactly what severance is for. And having done that, he's now saying if we resolve the case, that could change the contours of a future RICO case. It might or it might not. He's saying that maybe the government will look at it and say we've gotten enough out of this. We don't need to try the RICO case. He's hoping that. There's no question he's hoping that. But he's not telling them he won't try the case. And respectfully, he will. Let me just say one last thing and then I promise I will sit down. And I appreciate the additional moment because I want to address Judge Jordan's last question about why under those circumstances, why shouldn't it be sent back to a different judge? I've fully briefed the standards for reassignment and I'm not going to talk about how extraordinary it is. But I would respectfully request that you examine the record carefully with respect to the government's particular reasons that they give as to why Judge Martini could not be fair. A lot of them simply don't hold up in the face of the record. I've given a lot of examples on them. That time is up so I won't give them now. But I would, jury instructions that were actually given, statements that they attribute to him that were not actually made. What about the district judge's discussion with a member of the media? And what seemed to me at least in that discussion to be a criticism of the prosecutors, a completely extrajudicial action? The facts of that as they're in this record are as follows. There was a newspaper article that pointed out that Judge Martini had run for Congress in the mid-'90s and that Mr. McGrin had given him a raise. I know what he said. I know what he said. He was asked a question by the media about it. And just a shortcut here, I'm not interested in my question to you in the fact of his receipt of an 18-year-old campaign contribution or whatever it is. I'm asking you about the fact of an interview with a newspaper reporter and in the course of that interview a suggestion that necessarily is going out there to the public, not to a judicial audience, that the prosecutors somehow shouldn't be doing what they were doing or asking about what they're asking about. No, the specific statement he made, Judge Smith, was that it would be petty for the prosecutor to make a motion to have him recused. Exactly. The prosecutor did not make a motion to have him recused. So far from criticizing something that the government had done, he was preemptively saying they shouldn't do this. That's not a suggestion to the public made as it was to the news media or through the news media that the government shouldn't do this because it would be petty to do so. Even if it were, I think that's not an unreasonable reading. Even if it were, though, it's not a criticism of the prosecution of this case. It's not a criticism of RICO. It's not a criticism of any of the way the government had proceeded with respect to the rest of the matter. It is not that. Something that does appear, and it seems that there was some criticism of the government for taking this appeal, and I guess I'm wondering if that's something we should be troubled about. If the district judge is saying to the prosecutors, you know, you shouldn't be appealing my decision, is that problematic? That didn't happen, Judge Jordan. I mean, if you look at the transcript of that proceeding, Judge Martini had before him a motion to stay the proceedings. He had to ascertain whether he still had jurisdiction or whether the jurisdiction had gone to this court. So he had every right to request those briefs, and the government concedes that. The question is how he responded. The fairly acrimonious exchange that came about had to do with Judge Martini being peeved that the government was reporting about comments that had been made off the record in the in-chambers conferences. There was never, ever in any of that, and you can read it line by line, any criticism of the government taking this appeal. Absolutely none. There was a criticism of the government discussing off-the-record conversations, and for good reason, because in fact they're misquoted. And not having brought it up on a more timely basis, having waited. I think there was some discussion or some suggestion that the attorney for the government might have been hesitant to make such an objection, and Judge Martini's response was, well, you just did. The objection was finally made, but it was made late in the game. Thank you, Your Honor. There have been numerous in-camera conversations, and that was the first time it came up. You're correct. Mr. Sanders? I'd like to go in reverse order, if I may. We're starting with the reassignment request. Mr. Lussberg has pointed to, I think, he's looking at many of the bullet point items, if you look at the back of our opening brief. I think reassignment is justified by everything under 2106 that came before those bullet points. There was never a motion under 455 for recusal, was there? That's correct. But as I think the Supreme Court said in Latekin, as this Court has said in a couple of cases, for America in Wecht, right, the final Wecht appeal in Higdon, where it wasn't even sought, right, that this Court has a 2106 exists for the appellate court where a district court has recognized. No question, but it's extraordinary. It is extraordinary, and we don't make that request lightly, and we didn't. You've likened this case to Brunson, but in Brunson we were dealing with a circumstance where the judge wouldn't instruct a jury on the elements of the offense. I mean, it was a clear violation of law. Here you're upset. That's Higdon. Yeah. Both cases. Here you're upset because you don't like rulings which you concede are within the discretion of the district court. These are discretionary rulings. I mean, some of them, as Judge Smith has indicated, are exquisitely discretionary issues, you know, things that we just seldom weigh into like a severance matter. So isn't this a very different case from Brunson where you just got a clear violation of law and then you got a series of discretionary rulings that the government really doesn't like? Well, let me answer you, Judge Jordan. In Brunson, clearly there was an instructional error problem which provided a mandamus hook, right? But you also have the judge in that case doing the exact same thing that happened here where he, in fact, sua sponte, severed seven robberies that were a part of a single scheme and ordered them to trial seriatim, brushed off the prosecutor's argument, the same one we made here that he's just complaining about generic spillover prejudice, and then allowed the defendant to exploit those rulings in front of the jury. I listened to the oral argument of Brunson a couple of times, and most of it was occupied by the concern over the severance and how it was going to unfairly hamper the government's ability to prove these crimes. And the other difference... How much of it all did that figure into the opinion with respect to the argument? Well, it figured into the opinion because when this court reassigned that case, it invited the newly assigned judge to review the severance rulings and the 404B rulings. So the government got relief, and they hadn't appealed the severance in that case. Why don't you respond to the defense's assertion that, you know, this looks like a world where if the government can't win, it cries unfair, and that really tilts the table toward the government too much. That's like practically their opening page. Yes. And, frankly, we found that assertion offensive, and we think it's wrong because we've taken numerous appeals. I mean, we've taken many affirmative appeals where we don't ask for reassignment. We've looked back in the history of our office and even across the Justice Department and found, you know, a handful going back to the 70s where we've sought that relief. So it's not a request that we make lightly, and we didn't make it lightly here. But, Judge Jordan, you were asking Mr. Lussberg about statements Judge Martini was making that betray a fundamental antipathy, a firmly held and entrenched antipathy toward the RICO statute as it applies to this case. The Kennedy case came up in discussion with counsel. Did it not? Between Judge Martini and counsel. Yes, it did. What was the Kennedy case about, and why was that a subject of discussion? Because the Kennedy case is another case in which we had successfully appealed a decision of Judge Martini's to this Court. It was sent back to Judge Martini with a mandate saying impose the mandatory minimum sentence. And instead of doing so, he violated the mandate by sua sponte, coming up with other reasons to reach the same result he had that prompted the first appeal and made comments there on the record, by the way, that he found the mandatory minimum draconian and chastised our charging discretion. And the government has appealed that? Has appealed that. What is your strongest push for the judge's recusal? Is it because he has stated a strong dislike for RICO, or is it because he's hampering the prosecution's ability to present its case? Those two are bound up in each other. He believes that we've abused our charging discretion even by joining a murder in a RICO indictment with an attempted murder. How are they bound up in each other? Why, I would ask you, is Judge Martini's apparent dislike of the RICO statute a fair basis at all for disqualification? I was a district judge for 14 years, and I disliked then, as I continue to dislike, mandatory minimum sentences. Didn't like the sentencing guidelines either to a great extent. Said it frequently. But I did what I had to do. I certainly never had even an objection from prosecutors, let alone a disqualification motion. I mean, these are policy issues that judges ought to be entitled to have, as I indicated earlier, former Chief Justice Rehnquist had with the RICO statute. But if they do their jobs, why should it matter and why should it, more importantly, be a factor we consider when considering a request so extraordinary as disqualification of a district judge? I see my time is up because it's one thing to hold those views. It's another thing to allow them, I mean, as sincere as they are, and to have them drive rulings, which is what's happening here. His belief that the RICO statute is unfair and that it's unfair to use one crime to prove another when the charge is murder, even when it's highly probative, it says that if this case goes back to him and he has to try a RICO case eventually, I don't know how he can fairly try that case. I mean, if he believes the RICO statute is unfair as applied to Mr. Berggren or that this count violates the Constitution, the remedy for that is to dismiss it and then to let us appeal, and then we could have an honest debate with this Court over that issue. But when we suggested that. You just mentioned unconstitutional, didn't you? I mean, there hasn't been any suggestion of that or any argument of that or any reference to that in this record, has there? He said that the RICO counts as pled will violate Mr. Berggren's right to a fair trial and that we purposely joined them together to do that. And if he believes that, then he should enter an appealable order saying that and we could appeal. But when I suggested that he did that, what was his response? I tried that once. I did that once, meaning that was the basis for my first order dismissing the counts that this Court reversed. Mr. Sanders, thank you very much. Thank you very much. We have counsel's arguments and we appreciate them very much. We'll take them in case under advisement.